## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In RE: | ) | |
| | ) | |
| **PETER DADDOSIO,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | **Case No. 20-16830** |
| | ) | |
| **STRATEGIC FUNDING SOURCE, INC.,** | ) | |
| | ) | **Honorable Judge Donald R. Cassling** |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Adv. Case No. 20-A-00418** |
| | ) | |
| **PETER DADDOSIO,** | ) | |
| | ) | |
| Defendant. | ) | |

### AMENDED COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT

Strategic Funding Source, Inc., d/b/a Kapitus ("Strategic" or "Plaintiff"), by and through its counsel, submits its **AMENDED COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT** against Peter Daddosio ("Debtor" or "Defendant"). In support, Strategic states as follows:

### Jurisdiction and Venue

1.  Strategic initiates this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6) and Rule 4007, Federal Rules of Bankruptcy Procedure.

2.      The Debtor is a Debtor in Chapter 7 Case No. 20-16830 in this Court (the "Bankruptcy Case") and Strategic is one of his creditors. [1]

3.      This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(I).

4.      Venue in this court is proper pursuant to 28 U.S.C. § 1409.

## Parties

5.      Plaintiff, Strategic Funding Source, Inc. is a New York corporation with offices located at 120 West 45th Street, New York, New York 10036 and 2500 Wilson Boulevard, Suite 350 Arlington, Virginia 22201.

6.      Debtor is an individual residing at 4121 Judd Avenue, Schiller Park, Illinois 60176.

7.      Debtor is and was the sole owner and President of Concrete Guys, Inc. ("Concrete Guys" or "Merchant"), an Illinois corporation that was voluntarily dissolved in 2020, and is the sole owner of CGI Construction LLC ("CGI"), an Illinois limited liability company formed in April 2020.

8.      Strategic is a secured creditor of Debtor under a February 20, 2019, Virginia judgment against Debtor, subsequent Illinois registration of that judgment, and a citation to discover assets served in March 2020. Debtor owes Strategic $76,029.00 in judgment debt and accrued judgment interest from the date of the judgment.  In addition, under a guaranty obligation executed by Debtor, he owes attorneys' fees, filing fees, and costs incurred in Strategic's collection

---

[1] Notwithstanding any of the allegations and claims herein, the institution of this Adversary Proceeding, the filing of this amended complaint and any other appearance in this Adversary Proceeding and in the Bankruptcy Case, including the submission of motions, opposition papers, and entry of orders, is without waiver, and express reservation, of any and all of Strategic's rights, defense and remedies available at law and in equity, including, without limitation, under the Agreement (as defined below), Uniform Commercial Code, any other applicable federal or state law and/or commercial code, and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.  Strategic expressly incorporates any reservation of rights that it intends to include, or has included, in any proof of claim filed, or to be filed, in the Bankruptcy Case.

and enforcement efforts. Strategic has recovered certain equipment from Concrete Guys and continues to pursue GA Paving, Inc. for accounts receivable owed to Concrete Guys. The amount of Strategic's claim is reduced by the amount of any recovery, less attorneys' fees and costs of collection.

## Background

9.      As detailed below, on December 14, 2017, Debtor fraudulently induced Strategic entered into an Agreement to purchase future accounts receivable from Debtor's business, Concrete Guys. Later, Debtor improperly diverted the purchased receivables away from Strategic and for his own benefit by creating CGI Construction within weeks of Strategic registering the judgment against Debtor and initiating collection proceedings.

## Strategic Purchases Concrete Guys' Future Receivables Under the Agreement

10.      Strategic requires, as a threshold step in its consideration of whether to purchase a potential merchant's future receivables, that each merchant sign Strategic's agreement and provide certain written representations about its financial situation, operational plans, and intentions. Because Strategic's funding process is truncated from that of a standard financing institution, as is typical for the alternative financing industry, Strategic relies heavily upon a merchant's representations and warranties made in each agreement and confirmed in a recorded call. In fact, Strategic's counter signature to the agreement and funding are the last steps in the process.

11.      In the December 14, 2017, Agreement signed by Debtor – on behalf of Concrete Guys and individually as Guarantor – Debtor agreed to sell $100,533.00 (the "Receipts Purchased Amount") of Merchant's future business receipts in exchange for a payment from Strategic of $71,300.00 (the "Purchase Price"). (*See* Agreement at 1, attached as Ex. A.)

12.     Under the Agreement, Strategic purchased all of Merchant Concrete Guys' "future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from [Merchant]'s customers and/or other third party payors…" whether paid by cash, check, electronic transfer, or other form of monetary payment in the ordinary course of business (collectively, the "Receipts") until the time that the Merchant paid the Receipts Purchased Amount in full. *Id.*

13.     Once Strategic funded the Purchase Price, it became the owner of Merchant's Receipts up to the Receipts Purchased Amount of $100,533.00. *Id.*

14.     Under the terms of the Agreement, signed by Debtor on behalf of Concrete Guys and individually as Guarantor, Debtor agreed to and represented that he would collect and deposit all Receipts into a designated bank account (the "Account") and provide irrevocable authorization to Strategic to make ACH debits on a weekly basis from the Account, representing a percentage of the Receipts, until the Receipts Purchase Amount was remitted. (Ex. A at 3, Sec. 1.1).

15.     Debtor further represented, warranted, and covenanted in the Agreement that:

> Each of the above-signed Merchant and Owner(s) represents…the information provided herein and in all of [Strategic] documents, forms, and recorded interviews is true, accurate and complete in all respects.

> * * *

> Merchant represents, warrants, and covenants that as of this date and during the term of this Agreement:

> * * *

> 2.3 <u>Authorization</u>.   Merchant and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

> * * *

2.6 <u>Change of Name or Location.</u>   Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and [Strategic] or change any of its places of business.

\* \* \*

2.9 <u>No Bankruptcy or Insolvency.</u>  As of the date of this Agreement, Merchant represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

\* \* \*

2.12 <u>Business Purpose.</u> Merchant is a valid business in good standing under the laws of jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

(Ex. A at 4).

16.     The Agreement further emphasized that "**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION TO OBTAIN FINANCING."**  (Ex. A at 2.) The Agreement provides for attorney's fees and costs in Strategic's enforcement of its rights under the Agreement. (Ex. A at 4).

17.     The Debtor personally guaranteed Merchant's full performance under the Agreement, including performance of all representations, warranties, and covenants. (Ex.A at 6-7).

18.     In addition, Debtor and Merchant agreed that their obligations to Plaintiff were secured by an interest in "all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property. . . whether now

or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "Collateral")." (Ex. A at 6 Security Agreement.)

19.     After submitting his application, business and financial information, and written agreements and representations, Strategic and the Debtor engaged in a recorded telephone call on December 15, 2017, prior to the funding of the Purchase Price (the "Funding Call").

20.     One relevant portion of the Funding Call is transcribed below:

Plaintiff Representative: "Do you anticipate closing your business for any reason over the next twelve months, including vacations, renovations, seasonality, or slowed business periods?"

Debtor: "No."

Plaintiff Representative: "Do you anticipate selling your business in the next twelve months?"

Debtor: "No."

Plaintiff Representative: "Have you been planning to file or do you know of any reason to believe that your business will need to file for bankruptcy protection in the future?"

Debtor: "No."

21.     Later in the Funding Call, the following exchange occurred:

Plaintiff Representative: "And do you recognize that any false statements or misrepresentation may constitute Fraud and subject you to legal action?"

Debtor: "Yes."

22.     Upon information and belief, Debtor's representations regarding the continuation of his business as Concrete Guys, Inc. and his representations regarding periods of slowdown or shutdown, made in  both the Agreement and Funding Call,  were false, and Debtor knew they were false at the time he made them.

23.    In reliance on the materials submitted and the representations made by Debtor in the Agreement and the Funding Call, Strategic agreed to purchase certain of Concrete Guys' receivables and paid the Purchase Price of $71,300.00.

**Debtor Does Not Remit, and Diverts for His Own Use, the Receipts Owned by Strategic**

24.    Less than three months after receiving Strategic's financing, Debtor contacted Strategic due to what he referred to as a slowdown in work that would only last a few weeks.

25.    On March 9, 2018, Debtor submitted a Merchant Modification Application that requested a reduced debit for eight weeks, advising that "we have had difficulty keeping up with operating expenses."

26.    Strategic agreed to modify the ACH debit amounts from the Account in response to what Debtor had presented as a temporary situation.

27.    Debtor did not sufficiently fund the Account for even the modified debit amounts, resulting in insufficient funds in the Account for the ACH debit attempted on April 23, 2018.

28.    When a Plaintiff representative called Debtor on April 23, 2018, he advised that by that point Merchant had "no money."

29.    In fact, these representations were false. Debtor had opened an additional account (other than the Account designated for the collection of Receipts under the Agreement), where he deposited the Receipts owned by Plaintiff. On information and belief, he also revoked his authorization for Plaintiff's ACH debit in the designated Account, all in violation of the Agreement.

30.    Thereafter, Debtor failed to answer or respond to multiple calls and ignored correspondence requesting that he fill out a bank change form and provide updated information of the new account where he was collecting the Receipts.

31.     The last ACH debit that Strategic was able to make from the designated Account occurred on April 16, 2018, putting Merchant in breach of the Agreement a week later.

32.     Despite collecting Receipts from April 23, 2018, to the present, Debtor and Merchant have failed to remit or hold in trust any of the Receipts owned by Strategic.

### Plaintiff's Judgment Against Debtor and His Attempts to "Reorganize"

33.     Strategic filed suit against Debtor and Merchant on July 5, 2018, and judgment was entered against Debtor and Merchant in Virginia state court on February 20, 2019.

34.     Debtor filed for Chapter 7 bankruptcy on March 15, 2019, but the case was dismissed shortly thereafter on April 24, 2019, when Debtor failed to file required documents.

35.     Merchant then filed for Chapter 7 bankruptcy on July 2, 2019, but that case was also dismissed shortly thereafter on August 13, 2019, for failure to file required documents.

36.     Merchant subsequently filed for Chapter 11 bankruptcy on October 22, 2019, proceedings that were converted to a Chapter 7 proceeding on April 3, 2020, and Merchant's bankruptcy was closed on August 8, 2020.  The reason the case was converted was because Merchant did not file a plan of reorganization, and its counsel told the Court that Merchant was not operating due to the pandemic.

37.     In fact, the Merchant was operating under a different name. On April 11, 2020, a week after Merchant's bankruptcy proceedings converted to a Chapter 7 proceeding, an entity named "CGI Construction LLC" ("CGI") was created and filed for organization with the Illinois Secretary of State's office that was operating in the exact same line of business as Concrete Guys, Inc. The registered agent and sole manager identified is "Pete D'addosio," and the address listed for this individual is Debtor's home address.

38.    On information and belief, in an effort to hinder, delay and defraud Plaintiff, Debtor transferred all of Merchant's Receipts – which, as discussed above, were owned by Plaintiff under the Agreement – and all of Merchant's equipment – which was secured by Plaintiff's security agreement – to CGI.

39.    Despite his failed attempts to undergo reorganization in bankruptcy court, Debtor testified under oath that he had simply "reorganized" on his own terms. Debtor testified that he stopped performing work as Concrete Guys and started to perform the identical concrete work as CGI.  According to his own sworn testimony, Debtor's attempt to "reorganize" meant that he continued to pay himself and other creditors, such as Ford Motor Company, while refusing to pay Plaintiff the very Receipts he had sold to Plaintiff.

40.    In his Schedule A/B in the Bankruptcy Case underlying this Adversary Proceeding, Debtor admits that he is 100 percent owner of CGI and that CGI is his employer. In his Statement of Financial Affairs, he identifies CGI as having formed the same month that Concrete Guys stopped operating.

41.    In early March 2020, Strategic registered its judgment against Debtor in the Circuit Court of Cook County for the State of Illinois and served Debtor with a citation to discover assets. Because of COVID-19, for a period of months, no hearings were held in the Circuit Court of Cook County. Only after Strategic reached out to Debtor, once court dates were thereafter being set, did Debtor file the Bankruptcy Case underlying this Adversary Proceeding. Pursuant to the automatic stay in the Bankruptcy Case, the supplementary proceeding has been placed on the Bankruptcy Calendar of the Circuit Court of Cook County.

### Count I – False Representations, Fraudulent Transfer, and Actual Fraud – 11 U.S.C. § 523(a)(2)(A)

42.    Strategic restates and realleges Paragraphs 1 through 41 of the Complaint.

43.      Under 11 U.S.C. § 523(a)(2)(A), the court will hold that a debt is not dischargeable when it is obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's…financial condition."

44.      Upon information and belief, the Debtor entered into, and caused Merchant to enter into, the Agreement with the specific intent not to pay the Receipts Purchased Amount to Strategic and made false statements to Strategic with the intent to induce it to purchase the Receipts. After inducing Strategic to purchase the Receipts, the Debtor revoked authorization for the weekly debits, diverted Strategic's Receipts to the newly formed CGI entity, and transferred equipment and other assets to CGI, all in an effort to avoid remitting amounts owed to Strategic.

45.      Within three months after Strategic paid the Receipts Purchase Amount to Debtor, the Debtor did not have sufficient funds for Strategic to debit the agreed to weekly amount.

46.      Within four months of Strategic's funding, Debtor had revoked his authorization on the Account and remitted funds to another account, refusing to provide Strategic any alternative account from which to debit the Receipts owned by Strategic.

47.      Rather than remit the Receipts that Plaintiff had purchased under the Agreement, Debtor diverted the Concrete Guys' Receipts to an account other than the Account designated under the Agreement.

48.      Debtor thereafter caused Concrete Guys to involuntarily dissolve and to cease doing business under that name. Instead, Debtor purported to reorganize under the name CGI, performing the identical services as Concrete Guys with the identical ownership, all for the purpose of avoiding his obligations to Plaintiff.

49.      Debtor's conduct constitutes actual fraud, including but not limited to, the following acts of concealment and hinderance: failing to remit Receipts to the designated Account

under the Agreement, revoking the authorization allowing Plaintiff to ACH debit the Account, dissolving Concrete Guys and instead collecting receivables through CGI, transferring equipment and other assets to CGI, and operating his business as CGI, despite his representations he "will not conduct Merchant's businesses under any name other than as disclosed to [Strategic]" *See* Ex. A at 4, §2.6.

50.     In addition, Debtor made false statements to Strategic about his business operations and intentions to maintain the Account as agreed.   Upon information and belief, these  false statements include, but are not limited to, that Debtor and Merchant would only utilize one account to collect the Receipts; that it irrevocably authorized Strategic to debit the amounts due under the Agreement from such account; that it would ensure that sufficient funds remained in such account from which the Receipts would be paid; that it would not change the Account without authorization from Strategic; that Debtor and Merchant would not change the name of the company, and that Debtor and Merchant had no plans to shut down the business or file bankruptcy. Despite these statements, Debtor failed to remit the Receipts, revoked the authorization for Plaintiff to ACH debit the Account, diverted the Receipts to another account, shut down Concrete Guys and continued operations as CGI, and caused Concrete Guys to "reorganize" despite failing to do so through appropriate bankruptcy proceedings.

51.     Upon information and belief, Debtor made the above statements with an intent to deceive Strategic into purchasing receivables. Strategic reasonably relied upon these statements when considering whether to purchase Merchant's receivables.

52.     Upon information and belief, Debtor intended to, and in fact committed, actual fraud.

53.     Strategic suffered damages as a direct and proximate consequence of this actual fraud.

54.     There is an actual controversy between Strategic and the Debtor, which is within the jurisdiction of the United States Bankruptcy Court, and the Court may declare the rights and other legal relations of the parties to this action and enter relief based on its power to issue declaratory judgment.

55.     As a result, Strategic is entitled to a Judgment Order from this Court declaring that, pursuant to 11 U.S.C. § 523(a)(2)(A), Debtor's debt to Strategic is the amounts identified above in Paragraph 8, plus additional costs, fees, expenses, and interest as applicable, is non-dischargeable, and a judgment for money damages pursuant to the request herein.

### Count II – Embezzlement – 11 U.S.C. § 523(a)(4)

56.     Strategic repeats and realleges the above allegations set forth in Paragraph 1 through 55 and incorporates the same herein as though more fully stated at length.

57.     Debtor's liability to Strategic as alleged herein, is for embezzlement within the meaning of 11 U.S.C. § 523(a)(4).

58.     Debtor agreed that he would collect and deposit all of Merchant's business receipts into the Account and provided irrevocable authorization to Strategic to make its ACH debits of its percentage of receivables out of the Account. Nevertheless, Debtor revoked his authorization and remitted his Receipts to another account, despite continuing to operate Concrete Guys and thereafter CGI, and collecting Receipts throughout the time of his breach to the present.

59.     Debtor committed embezzlement when he appropriated receivables that Strategic had entrusted to him and failed to hold them in trust or remit them to Strategic as promised.

60.    There is an actual controversy between Strategic and the Debtor, which is within the jurisdiction of the United States Bankruptcy Court, and the Court may declare the rights and other legal relations of the parties to this action and enter relief based on its power to issue declaratory judgment.

61.    As a result, Strategic is entitled to a Judgment Order from this Court declaring that, pursuant to 11 U.S.C. § 523(a)(4), Debtor's debt to Strategic in the amounts identified above in Paragraph 8, plus additional costs, fees, expenses, and interest as applicable, is non-dischargeable, and a judgment for money damages pursuant to the request herein.

## Count III – Willful Malicious Conduct – 11 U.S.C. § 523(a)(6)

62.    Strategic repeats and realleges the above allegations set forth in Paragraph 1 through 61 and incorporates the same herein as though more fully stated at length.

63.    Pursuant to Section 532(a)(6) of the Bankruptcy Code, a debt incurred by a debtor who engages in willful malicious conduct which results in damage shall be nondischargeable.

64.    Strategic believes and alleges that Debtor intended to evade his obligations under the Agreement by using an account other than the Account designated under the Agreement, revoking the authorization allowing Plaintiff to ACH debit the Account, converting Strategic's collateral by transferring it to CGI Construction, LLC, dissolving Concrete Guys and instead collecting receivables through CGI Construction LLC.

65.    Debtor also engaged in the following willful and malicious acts, among others:

a)    On or about December 14, 2017, Debtor did willfully and maliciously execute the Agreement in which he falsely and fraudulently represented that he would not take any action that could have any adverse effect upon Merchant's obligations under the Agreement, including, but not limited to, agreeing that he would not conduct Merchant's businesses under

any other name.

       b)      Upon information and belief, on or about December 14, 2017, Debtor did willfully and maliciously execute the Agreement in which he falsely and fraudulently represented that Debtor and Merchant would only utilize one account for remitting the purchased receivables to Strategic, irrevocably authorized Strategic to debit the amounts due under the Agreement from such account, and would ensure that sufficient funds remained in such account from which the purchase receivables would be paid.  In fact, in less than three months, he advised Strategic did not have sufficient funds for the agreed to ACH debits; within four months, he closed the account without notice or new account information provided, and when Strategic was in supplementary proceedings, CGI received and/or began collection Merchant's Receipts.

       c)      Debtor caused Merchant to receive money from Strategic based on Debtor's false and fraudulent statements and acts.

       d)      "Reorganizing" outside of bankruptcy proceedings by performing the exact same concrete services that he had performed as Concrete Guys through CGI, both of which were 100 percent owned by Debtor, to evade his obligations to Plaintiff;

       e)      Diverting Concrete Guys' Receipts to CGI Construction LLC, transferring Merchant's equipment and other assets to CGI Construction, LLC; and

       f)      Paying himself and other creditors from the Receipts he sold to Plaintiff.

66.      Debtor's activities described herein constitute willful and malicious conduct which resulted in damage to Strategic, and Debtor's debt to Strategic and is nondischargeable.

67.      There is an actual controversy between Strategic and the Debtor, which is within the jurisdiction of the United States Bankruptcy Court, and the Court may declare the rights and

other legal relations of the parties to this action and enter relief based on its power to issue declaratory judgment.

68. As a result, Strategic is entitled to a Judgment Order from this Court declaring that, pursuant to 11 U.S.C. § 523(a)(6), Debtor's debt to Strategic is at least in the amounts identified above in Paragraph 8, plus additional costs, fees, expenses, and interest as applicable, is non-dischargeable, and a judgment for money damages pursuant to the request herein.

WHEREFORE, Plaintiff requests that the Court enter judgment as follows:

A. Judgment declaring the entire debt in the amount identified in paragraph 8, above, owed by Debtor to Strategic is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6) in this Bankruptcy Case, in any other chapter under Title 11 to which this case may be converted, and in any future bankruptcy case filed by or against Debtor;

B. For an award of damages comprising the judgment amount due and interest at the Virginia statutory rate of 6 percent from the date of the judgment, February 20, 2019, onward;

C. An award of all fees and costs incurred in collection proceedings and enforcement actions against Debtor and Merchant, including all fees and costs in bringing this action; and

D. Such other relief as is just and proper under the circumstances.

Dated:  March 17, 2022

Respectfully submitted:

**STRATEGIC FUNDING SOURCE, INC.**

/s/ Susan Valentine_____
One of Its Attorneys

Susan Valentine (IL ARDC No. 6196269)
Lydia A. Bueschel (IL ARDC No. 6274638)
Valentine Austriaco & Bueschel, P.C
105 W. Adams Street 35th Floor
Chicago, IL  60603
312-288-8285 (t)
312-638-8137 (f)
svalentine@vablawfirm.com
lbueschel@valawfirm.com

# EXHIBIT A

Contract#: 746781



**211-D Bulifants Boulevard, Williamsburg, Virginia**
**Ph. 800-780-7133 / 757-903-4889**

## REVENUE BASED FACTORING (RBF/ACH) AGREEMENT

Agreement dated <u>December 14 2017</u> between **Strategic Funding Source, Inc. ("SFS")** and the merchant listed below ("the **Merchant**").
    (Month)(Day)(Year)

### MERCHANT INFORMATION

Merchant's Legal Name: <u>CONCRETE GUYS, INC.</u>

D/B/A: <u>Concrete Guys</u>                                                          State of Incorporation / Organization: <u>IL</u>

Type of entity: ( X ) Corporation (    ) Limited Liability Company (    ) Limited Partnership (    ) Limited Liability Partnership (    ) Sole Proprietor

Physical Address: <u>4121 Judd Ave</u>              City: <u>Schiller Park</u>              State: <u>IL</u>                  Zip: <u>60176-1835</u>

Mailing Address:                      City:                      State:              Zip:

Date business started (mm/yyyy): <u>04/2003</u>          Federal ID# <u>06-1695963</u>

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to SFS, as the lead purchaser for itself and other co-investors [making SFS on behalf of itself and all co-investors (collectively the Funders), the absolute owner] in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (collectively the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), until such time as the "Receipts Purchased Amount" has been delivered by Merchant to SFS. The Receipts Purchased Amount shall be paid to SFS by the Merchant irrevocably authorizing only one depositing account acceptable to SFS (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's Receipts, until such time as SFS receives payment in full of the Receipts Purchased Amount. In consideration of servicing the account, the Merchant hereby authorizes SFS to ACH Debit the "Specified Daily Amount" from the merchant's bank account as the base payment credited against the Specified Percentage due. It is the Merchants responsibility to provide bank statements for any and all bank accounts held by the Merchant to reconcile the daily payments made against the Specified Percentage permitting SFS to debit or credit the difference to the merchant so that payment equals the Specified Percentage.  Failure to provide all of their bank statements in a timely manner or missing a month shall forfeit all rights to future reconciliations.  SFS may, upon Merchant's request, adjust the amount of any payment due under this Agreement at SFS's sole discretion and as it deems appropriate in servicing this Agreement.  Merchant understands that it is responsible for ensuring that funds adequate to cover amount to be debited by SFS remains in the account.  Merchant will be held responsible for any fees incurred by SFS resulting from a rejected ACH attempt or an event of default.  (See Appendix A) SFS is not responsible for any overdrafts or rejected transactions in the Merchants account which may result from SFS' scheduled ACH debit under the terms of this agreement.  Notwithstanding anything to the contrary in this Agreement or any other agreement between SFS and Merchant, upon the violation of any provision contained in Section 1.11 of the FACTORING AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the FACTORING AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this agreement is contained in Appendix A.

**\*\*\* Obtaining another Cash Advance or similar financing, secured or unsecured during the performance of this agreement shall constitute an Event of Default.\*\*\***

Purchase Price: **$71,300.00**          Specified Percentage: **13%**          Specific Weekly Amount: **$2,111.00**          Receipts Purchased Amount: **$100,533.00**

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH ON PAGE 2, THE "MERCHANT SECURITY AGREEMENT" AND "ADMINISTRATIVE FORM" HEREOF ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**MERCHANT #1**

By   <u>Peter Daddosio, Owner</u>                                    _____
                 (Print Name and Title)                                              (Signature)

**MERCHANT #2**

By   _____                          _____
                 (Print Name and Title)                                              (Signature)

**OWNER/GUARANTOR #1**

By   <u>Peter Daddosio, Owner</u>                                    _____
                 (Print Name and Title)                                              (Signature)

**OWNER/GUARANTOR #2**

By   _____                          _____
                 (Print Name and Title)                                              (Signature)

**STRATEGIC FUNDING SOURCE, INC.**

By   _____                          _____
                 (Company Officer)                                              (Signature)

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represents that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of SFS documents, forms and recorded interviews is true, accurate and complete in all respects.  If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between SFS and Merchant and SFS shall be entitled to all remedies available under law. Merchant and each of the above-signed Owners authorizes SFS, its agents and representatives and any credit reporting agency engaged by SFS, to (i) investigate any references given or any other statements or data obtained from or about

Merchant or any of its Owners for the purpose of this Agreement, and (f) obtain credit report at any time now or for so long as Merchant and or Owner(s) continue to have any obligation owed to SFS.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL FRAUDULENT INDUCEMENT TO OBTAIN FINANCING.**

DocuSign Envelope ID: 6215D139-C4B4-4E6B-9373-B2D9E1DC410A

Case 20-00418    Doc 34    MERCHANT AGREEMENT TERMS AND CONDITIONS 03/17/22    Entered 03/17/22 17:01:05    Desc Main
Document    Page 20 of 25

## I.  TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to SFS, with a Bank acceptable to SFS, to obtain electronic fund transfer services. Merchant shall provide SFS and/or its authorized agent with all of the information, authorizations necessary for verifying Merchant's receivables, receipts and deposits into the account. Merchant shall authorize SFS and/or it's agent to deduct the amounts owed to SFS for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant by permitting SFS to withdraw the specific daily amount credited against the specified percentages by ACH debit of the Merchant account. The authorization shall be irrevocable without the written consent of SFS.

**1.2 Term of Agreement.** This Agreement shall have an indefinite term that shall last either until all the Merchant's obligations to SFS are fully satisfied. This shall include but not be limited to any renewals, outstanding fees or costs.

**1.3 Future Purchases.** SFS reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion.

**1.4 Financial Condition. Merchant and Guarantor(s) authorize SFS and its agents to investigate their financial responsibility and history, and will provide to SFS any bank or financial statements, tax returns, etc., as SFS deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. SFS is authorized to update such information and financial profiles from time to time as it deems appropriate.**

**1.5 Transactional History.** Merchant authorizes their bank to provide SFS with Merchant's banking or processing history to determine qualification or continuation in this program.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor/Bank, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by SFS for monies owed to SFS from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by SFS.

**1.7 No Liability.** In no event will SFS(or any of the Funders) be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, SFS and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and SFS agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SFS to Merchant. Merchant agrees that the Purchase Price is in exchange for the sale of future Receipts pursuant to this Agreement equals the fair market value of such Receipts. SFS has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to SFS in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In

no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that SFS has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and SFS shall promptly refund to Merchant any interest received by SFS in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that SFS not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.10 Power of Attorney** Merchant irrevocably appoints SFS as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SFS from Processor/Bank, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SFS; and (v) to file any claims or take any action or institute any proceeding which SFS may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.11 Protections Against Default.** The following Protections 1 through 7 may be invoked by SFS, immediately and without notice to Merchant in the event (a) Merchant changes its arrangements with Processor/Bank in any way that is adverse to SFS; (b) Merchant changes the deposit account through which the Receipts are settled., or permits any event to occur that could cause diversion of any of Merchant's transactions to another account; (c) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of SFS, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to SFS; or (d) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments that are settled through Processor. These protections are in addition to any other remedies available to SFS at law, in equity or otherwise pursuant to this Agreement.

Protection 1.  The full uncollected Receipts Purchased Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately

Protection 2.  SFS may enforce the provisions of the Personal Guarantee of Performance against the Guarantor.

Protection 3.  Merchant shall, upon execution of this Agreement, deliver to SFS an executed confession of judgment in favor of SFS in the amount of the Receipts Purchased Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, SFS may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon.

Protection 4.  SFS may enforce its security interest in the Collateral identified in Article III hereof.

Protection 5.  The entire Receipts Purchased Amount shall become immediately payable to SFS from Merchant.

Protection 6.  SFS may proceed to protect and enforce its rights and remedies by legal action. In any such litigation, in which SFS shall recover judgment against Merchant, Merchant shall be liable for all of SFS's costs of litigation, including but not limited to all reasonable attorneys' fees and court costs.

Protection 7.  Merchant shall, upon execution of this Agreement, deliver to SFS an **executed assignment of lease of Merchant's premises** in favor of SFS. Upon breach of any provision in this paragraph 1.12, SFS may exercise its rights under such assignment of lease.

Protection 8.  SFS may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes SFS to disclose information concerning Merchant's and each Owner's credit standing (including credit bureau reports that SFS obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner hereby waives to the maximum extent permitted by law any claim for damages against SFS or any of its affiliates and the Funders relating to any (i) investigation undertaken by or on behalf of SFS as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by SFS, including this Agreement and any other SFS documentations (collectively, "Confidential Information") are proprietary and confidential information of SFS. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of SFS to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 1.13.

**1.14 Publicity.** Merchant and each Owner only authorizes SFS to use its, his or her name in a listing of clients and in advertising and marketing materials with their express written consent.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that SFS may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SFS and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II.  REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Its bank and financial statements, copies of which have been furnished to SFS, and future statements which will be furnished hereafter at the discretion of SFS, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise SFS of any material adverse change in its financial condition, operation or ownership. SFS may request statements at any time

during the performance of this Agreement and the Merchant shall provide them to SFS within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized**.**

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming SFS as loss payee and additional insured in amounts and against risks as are satisfactory to SFS and shall provide SFS proof of such insurance upon request.

**2.5 Intentionally omitted**

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and SFS or change any of its places of business.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from SFS to Merchant, execute, acknowledge and deliver to SFS and/or to any other person, person firm or corporation specified by SFS, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy or Insolvency.** As of the date of this Agreement, Merchant represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing Protections 2 and 3 are immediately invoked.

**2.10 Additional Financing.** Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other than SFS without their written permission.

**2.11 Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of SFS.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Default Under Other Contracts.** Merchant's execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of

Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing within 120 days of funding its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of SFS; (j) Merchant shall change its depositing account without the prior written consent of SFS; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with SFS.

**3.2 Remedies.** In case an Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, SFS on its own and on behalf of the Funders may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Performance Guarantee) or any other legal or equitable right or remedy. All rights, powers and remedies of SFS in connection with this Agreement may be exercised at any time by SFS after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 Costs.** Merchant shall pay to SFS all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of SFS's remedies set forth in Section 4.2 herein, including but not limited to court costs and attorneys' fees.

**3.4 Required Notifications.** **Merchant is required to give SFS written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give SFS seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.**

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by SFS.

**4.2 Assignment.** Merchant acknowledges and understands that SFS is acting on its own behalf and as the administrator and lead investor for a group of independent participants a list of which can be provided to Merchant after funding and upon written notice to SFS. SFS may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by regular mail, Facsimile or Email, to the respective parties to this Agreement at the addresses provided and shall become effective only upon receipt.

**4.4 Waiver Remedies.** No failure on the part of SFS to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The

remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, SFS (and it's Participants) and their respective successors and assigns, SFS's Participants shall be third party beneficiaries of all such agreements. except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SFS which consent may be withheld in SFS's sole discretion. SFS reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if SFS so elects, be instituted in any court sitting in Virginia, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by SFS to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement hereto embody the entire agreement between Merchant and SFS and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.9 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.10 ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* **THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.**

**Covered claims**

a.   *Merchant and/or Performance Guarantors, (collectively hereinafter referred to as "Merchant") or Funders may arbitrate* any claim, dispute or controversy between Merchant and Funders arising out of or related to Merchant account, a previous related account or the Merchant/Funders relationship (called "Claims").

b.   **If arbitration is chosen by any party, neither Merchant nor** Funders **will have the right to litigate that Claim in court or have a jury trial on that Claim.**

c.   Except as stated below, all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, Merchant or Funders negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims.  This also includes Claims made by or against anyone connected with Funders or Merchant or claiming through Funders or Merchant, or by someone making a claim through Funders or Merchant, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**

d.   Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.

e.   Funders will not initiate arbitration to collect a debt from Merchant unless Merchant choose to arbitrate or assert a Claim against Funders.  If Merchant assert a Claim against Funders, Funders can choose to arbitrate, including actions to collect a debt from Merchant.  Merchant may arbitrate on an individual basis Claims brought against Merchant, including Claims to collect a debt.

f.   Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis.  The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis.  If arbitration is chosen by any party, neither Merchant nor Funders may pursue a Claim as part of a class action.  Moreover, claims brought by or against one or more persons may not be combined in one arbitration.  However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**

g.   Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA arbitration rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision.  Merchant can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879.  Merchant or Funders may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel.  Any in-person hearing will be held in the same city as the U.S. District Court closet to Merchant billing address.

h.   Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered.  Neither Merchant nor Funders waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit.  To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

i.   The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery.  The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so.  The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statute of limitations, and may award damages or other relief under applicable law.

j.   The arbitrator shall make any award in writing and, if requested by Merchant or Funders, may provide a brief statement of the reasons for the award.  An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**Paying for arbitration fees**

k.   Arbitration fees will be allocated according to the applicable AAA Rules.  If Funders prevails, Funders may not recover the arbitration fees, unless the arbitrator decides Merchant's Claim was frivolous.  All parties are responsible for their own attorney's fees, expert fees and any other expenses, unless the arbitrator awards such fees or expenses to Merchant or Funders based on applicable law.

**The final award**

l.   Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award.  The arbitration appeal shall be determined by a panel of 3 arbitrators.  The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote.  Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules.  An award by a panel on appeal is final.  A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

m.   This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between Merchant and Funders, including the bankruptcy of any party and any sale of Merchant account, or amounts owed on Merchant account, to another person or entity.  If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim.  This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between Merchant and Funders.

**4.11  Counterparts: Facsimile and PDF Acceptance.**  This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument.  Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

**INITIALS: _____**

DocuSign Envelope ID: 82138139-C2BA-4E6D-9373-52D9F1DC4103

STRATEGIC FUNDING SOURCE, INC. – SECURITY AGREEMENT AND GUARANTY

Borrower's Legal Name: <u>CONCRETE GUYS, INC.</u>

D/B/A: <u>Concrete Guys</u>

Physical Address: <u>4121 Judd Ave</u>    City: <u>Schiller Park</u>    State: <u>IL</u>    Zip: <u>60176-1835</u>

Federal ID# <u>06-1695963</u>

<strong>SECURITY AGREEMENT</strong>

<strong><u>Security Interest.</u></strong>  To secure Merchant's payment and performance obligations to SFS and its affiliates or the Funders, a list of which may be provided to the Merchant if requested in writing after the funding of the purchase closes under the Merchant Cash Advance Agreement between Merchant and SFS (the "<u>Merchant Agreement</u>"), Merchant hereby grants to SFS a security interest in all personal property of Merchant, including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, as those terms are defined in Article 9 of the Uniform Commercial Code of the Commonwealth of Virginia as amended (the "<u>UCC</u>"), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC (collectively, the "<u>Collateral</u>").  If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to SFS under any other agreement between Merchant and SFS will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting SFS's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with SFS, any security interest granted to SFS under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting SFS's interest in the Collateral.

<strong><u>Cross-Collateral.</u></strong>  To secure Guarantor's payment and performance obligations to SFS (and the Funders) under this Merchant Security Agreement and Guaranty (this "Agreement"), each Guarantor hereby grants SFS, for itself and its participants, a security interest in (the "<u>Additional Collateral</u>"). Each Guarantor agrees and acknowledges that SFS will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to SFS under any other agreement between Guarantor and SFS will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting SFS's interest in the Additional Collateral.

Guarantor further acknowledges and agreements that, if Guarantor enters into future Agreements with SFS, any security interest granted to SFS under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting SFS's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as SFS deems necessary to perfect or maintain SFS's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements.  Each of Merchant and each Guarantor hereby authorizes SFS to file any financing statements deemed necessary by SFS to perfect or maintain SFS's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to SFS with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with SFS's rights.  Merchant and each Guarantor shall be jointly and severally liable for and shall pay to SFS upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by SFS in protecting, preserving and enforcing SFS's security interest and rights.

<strong><u>Negative Pledge.</u></strong>  Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral or Additional Collateral, as applicable without written permission of SFS.

<strong><u>Consent to Enter Premises and Assign Lease.</u></strong>  SFS shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms.  In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, SFS may execute its rights and remedies under the Assignment of Lease.  Merchant also agrees that SFS may enter into an agreement with Merchant's landlord giving SFS the right: (a) to enter the Premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

<strong><u>Remedies.</u></strong>  Upon any Event of Default, SFS may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to SFS, whether by acceleration or otherwise.

<strong>GUARANTY</strong>

<strong><u>Personal Guaranty of Performance.</u></strong>  The undersigned Guarantor(s) hereby guarantees to SFS, and its affiliates or the Funders, Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Factoring Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "<u>Guaranteed Obligations</u>").  Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Factoring Agreement, and (ii) if within 120 days of funding Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts. (It is understood by all parties that this Guaranty is not an absolute personal guaranty of payment and that the signors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

<strong><u>Guarantor Waivers.</u></strong>  In the event that Merchant fails to make a payment or perform any obligation due to Guarantor's actions or malfeasance under the Factoring Agreement, SFS may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral SFS may hold pursuant to this Agreement or any other guaranty.

SFS does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Factoring Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) SFS's acceptance of this Agreement ; and (v) any renewal, extension or other modification of the Factoring Agreement or Merchant's other obligations to SFS.  In addition, SFS may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement : (i) renew, extend or otherwise modify the Factoring Agreement or Merchant's other obligations to SFS; (ii) release Merchant from its obligations to SFS; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other

guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for paying either of the Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to SFS under the Factoring Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation ; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.  In the event that SFS must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.**  Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

INITIALS: _____

**Joint and Several Liability.**  The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

---

**Communications.**  SFS may from time to time notify Merchant(s) and Owner(s) of various promotional offers and other marketing information.  By signing this Agreement, Merchant(s) and Owner(s) expressly consents and authorizes SFS to call any telephone number provided by Merchant(s) and Owner(s) in this Agreement or corresponding Administrative Form, including cellular phone numbers and residential landlines for marketing and promotional purposes.  Merchant(s) and Owner(s) are further consenting to and authorizing SFS's use of an automatic Telephone Dialing Systems or "auto dialer" and pre-recorded voice message in disseminating promotional offers and marketing information to Merchant(s) and Owner(s) at all numbers provided by Merchant(s) and Owner(s) in this Agreement or corresponding Administrative Form, including cellular phone numbers and residential landlines.  Merchant(s) and Owner(s) agree to update the numbers provided if they change, or upon request by SFS.

Please note that Merchant(s) and Owner(s) are not required to consent to this section of the agreement in order to qualify for financing or obtain any other products or services from SFS.  If Merchant(s) or Owner(s) do not agree to be called for marketing purposes or as otherwise outlined in the foregoing paragraph, please check (opt-out) here:

Merchant 1: [ ]    Owner 1: [ ]

Merchant 2: [ ]    Owner 2: [ ]

---

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "FACTORING AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY.  CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE FACTORING AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO.  IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID.  ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

MERCHANT #1

By ____Peter Daddosio, Owner_____
       (Print Name and Title)                                      (Signature)
                                                                    526F21B197C3443...

MERCHANT #2

By _____
       (Print Name and Title)                                      (Signature)

OWNER/GUARANTOR #1

By ____Peter Daddosio, Owner_____
       (Print Name and Title)                                      (Signature)
                                                                    526F21B197C3443...

OWNER/GUARANTOR #2

By _____
       (Print Name and Title)                                      (Signature)

**STRATEGIC**
FUNDING

## APPENDIX A: THE FEE STRUCTURE:

**A. Origination Fee**                                                      **To cover underwriting and related expenses**

| Amount Funded | Origination Fee |
|---|---|
| Up to $15,000.00 | $395.00 |
| Over $15,000.00 | 2.5% of Amount Funded |
| Due Diligence Fee | $0.00 |

**B. Rejected ACH or NSF Fee**                                **If after FOUR TIMES and Merchant fails to respond to telephone and electronic communication a default is declared**

**Daily ACH Program**

| Amount Funded | Reject Fee |
|---|---|
| Up to $7,500.00 | $25.00 |
| $7,501.00-$50,000.00 | $35.00 |
| $50,001.00-$100,000.00 | $50.00 |
| $100,001.00-$250,000.00 | $75.00 |
| Over $250,000.00 | $100.00 |

**Weekly ACH Program**

| Amount Funded | Reject Fee |
|---|---|
| Up to $7,500.00 | $75.00 |
| $7,501.00-$50,000.00 | $99.00 |
| $50,001.00-$100,000.00 | $175.00 |
| $100,001.00-$250,000.00 | $275.00 |
| Over $250,000.00 | $395.00 |

**C. Bank Change Fee**                        $75.00        **When Merchant requires a change of account to be Debited requiring us to adjust our system**

**D. Default Fee**                                    $2,500.00    **When Merchant BLOCKS account from our Debit ACH, which places them in default (per contract)**

**E. UCC Termination Fee**                $150.00        **When Merchant request a UCC termination**

**F. Administrative Fee**                        $0.00

**Miscellaneous Service Fees.** Merchant shall pay certain fees for services related to the origination and maintenance of accounts which may include but not be limited to: Merchants funding is done electronically to their designated bank account and charged a fee of $50.00 for a Fed Wire or $20.00 for an ACH. The fee for underwriting and origination is paid from the funded amount in accordance with the schedule on this page. If Merchant is utilizing a Bridge / Control Account, there is an upfront fee of $395.00 for the bank fees and administrative costs of maintaining such account for each cash advance agreement with Merchant. Fund transfers from Bridge / Control Accounts to Merchant's operating bank account will be charged $15.00 per month via ACH. This fee will continue if the bridge account remains open after the RTR is paid. Merchant will be charged $75.00 for each change of its operating bank account once active with SFS. Any administrative adjustments associated with changes to the Specified Percentage will incur a fee of $100.00 per occurrence. (All fees are subject to change). Merchant and its sales representative / broker may have agreed to an additional fee in relation to their services. This fee is not charged by SFS nor does SFS receive any portion of it.

MERCHANT INITIALS: _____