**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 20 B 16830 |
| | ) | |
| PETER DADDOSIO, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Donald R. Cassling |
| | ) | |
| | ) | |
| | ) | |
| STRATEGIC FUNDING SOURCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 20 A 00418 |
| | ) | |
| v. | ) | |
| | ) | |
| PETER DADDOSIO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter is before the Court following a trial on the amended complaint filed by Plaintiff Strategic Funding Source, Inc., against Debtor Peter Daddosio, seeking to deny dischargeability of a debt pursuant to Sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. After the parties tried this matter to the Court, the Court ordered the parties to submit post-trial briefs (Adv. Dkt. Nos. 57-58) and took the matter under advisement. Having reviewed the record and considered the arguments of the parties, the Court enters judgment in favor of Plaintiff and against Defendant for the reasons which follow.

**INTRODUCTION**[1]

The Debtor has been a subcontractor in the construction business for many years, primarily providing concrete-related services. (Tr. 54:14-19, App'x to Def.'s Post-Trial Brief.) In 2003, he formed a company, Concrete Guys, Inc., through which to conduct his business of removing and replacing concrete in residential settings. (Stip. Facts No. 20, Adv. Dkt. No. 51.)

That company operated profitably for several years, before encountering cashflow issues toward the end of 2017. When Concrete Guys' cashflow declined, the Debtor caused Concrete Guys to enter into a financing agreement with the Plaintiff. (Pl.'s Ex. No. 1.) In exchange for

---

[1] The facts set forth in this Introduction are almost entirely undisputed. Those few that are disputed bear upon Debtor's intent as relevant to Section 523 of the Bankruptcy Code. These disputed facts are discussed and assessed in the Court's analysis following this introduction.

Plaintiff's extension of $71,300 in financing, Concrete Guys agreed to make weekly payments of $2,111 to Plaintiff until Plaintiff had been paid $100,533. (*Id.* at p. 1.) Those payments were made through weekly debits by Plaintiff on Debtor's bank account, as authorized in writing by Debtor. As further security for the loan, the parties' agreement also gave Plaintiff a blanket lien on all of Concrete Guys' assets and the Debtor guaranteed Concrete Guys' performance under the agreement. (Stip. Facts Nos. 1 & 3-4.)

Concrete Guys initially performed as required under the agreement. However, its cashflow issues worsened when the largest contractor that Concrete Guys served began experiencing its own financial difficulties. (Tr. 87:16-88:20.) That contractor slowed and eventually stopped paying Concrete Guys' invoices, before finally filing its own bankruptcy. (*Id.*) Once that happened, the Debtor unilaterally revoked Plaintiff's authorization to debit Concrete Guys' account, so that Plaintiff was unable to continue to debit that account. In addition, Concrete Guys defaulted on its repayment obligations. (Stip. Facts No. 7.) At that point, Plaintiff had made seventeen weekly withdrawals from the Concrete Guys' bank account (totaling $32,854), leaving an unpaid debt of $70,529. (Stip. Facts No. 6; Pl.'s Ex. 29 at p. 1.)

Plaintiff thereupon filed a lawsuit in Virginia state court against the Debtor and Concrete Guys to enforce its rights under the financing agreement. It obtained a judgment against both of them and then domesticated that judgment in Cook County, Illinois. (Pl.'s Ex. 29; Stip. Facts No. 10.) Once that Virginia judgment had been domesticated in Illinois, (Stip. Facts No. 10), the Debtor caused Concrete Guys to file three successive bankruptcy cases in the Northern District of Illinois. (Stip. Facts Nos. 8, 9, & 11; Tr. 53:13-22.) The first two of these cases were filed under Chapter 7 but dismissed for Concrete Guys' failure to file certain required documents, while the third case was ultimately converted from Chapter 11 to Chapter 7. (Stip. Facts Nos. 8-9, 11.) Concrete Guys never reorganized. (Tr. 53:20-22.)

Upon the conversion of Concrete Guys' third bankruptcy case to Chapter 7, the Debtor caused a new entity to be formed, CGI Construction, LLC. (Tr. 53:23-54:8.) This new entity engaged in exactly the same work as Concrete Guys (albeit on a smaller scale), used the same phone number as Concrete Guys, operated from the same location as Concrete Guys, used the same liened equipment as Concrete Guys, and acted as a subcontractor for the same clients as Concrete Guys. (Tr. 54:9-55:11, 60:18-24 & 83:9-14; Stip. Facts Nos. 26 & 27.)  Like Concrete Guys, CGI Construction was solely owned by the Debtor. (Stip. Facts No. 23.)

After the Debtor began operating CGI Construction, he began selling or giving away certain assets of Concrete Guys that he could not use in or did not need for CGI Construction's operations. (Tr. 57:14-60:24 & 65:16-19.) He did so despite the fact that those assets were encumbered by Plaintiff's lien and were transferred without Plaintiff's permission. In addition, rather than apply the proceeds of these sales to Plaintiff's debt, the Debtor used those proceeds for his personal expenses or those of CGI Construction. (*E.g.*, Tr. 59:9-10, 60:12-17, 61:5-14, 62:7-18.)

**ANALYSIS**

The discharge provided by the Bankruptcy Code is meant to give debtors a financial "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003); *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). This privilege is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). The party seeking to establish an exception to the discharge of a debt bears the burden of proving each element by a preponderance of the evidence. *Id*. at 291. Exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000).

Plaintiff advances three separate grounds for finding that Debtor's obligations under the financing agreement are nondischargeable:

- Debtor's debt should be found to be nondischargeable because Debtor's sale of Concrete Guys' assets in contravention of Plaintiff's rights as a secured creditor constitutes embezzlement under Section 523(a)(4), citing this Court's unpublished order entered in *Ford Motor Credit Co. LLC v. Moroni (In re Moroni)*, Bankr. No. 13 B 02610, Adv. No. 13 A 00860, slip op. (Bankr. N.D. Ill. Jan. 31, 2017).
- Debtor's diversion of Concrete Guys' assets and revenue constitutes conversion of Plaintiff's property, which is an intentional tort supporting a finding of nondischargeability.
- Debtor's actions support a finding of actual fraud resulting in nondischargeability under Section 523(a)(2)(A), as the Supreme Court has interpreted that statute in *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016).

In response, the Debtor advances the following arguments:

- Concrete Guys paid the Plaintiff everything he owed Plaintiff under the financing agreement;
- Debtor never acted with fraudulent intent or with a willful and malicious mindset;
- Concrete Guys' assets were not transferred to CGI Construction; and
- Any monies CGI Construction paid to the Debtor did not belong to the Plaintiff.

The Court rejects each of Debtor's arguments.

A.      Section 523(a)(4) – Embezzlement

Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989). Numerous courts (including the undersigned) have held that a debtor commits embezzlement under Section 523(a)(4) when he sells property subject to a voluntary lien and then fails to remit the sale's proceeds to the lienholder. *E.g.*, *Moroni*, slip op. at p. 5; *Jones v. Hall (In re Hall)*, 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003) (citing cases). Debtor does not dispute that he sold assets that were subject to Plaintiff's blanket lien and failed to use those proceeds to repay

his debt to Plaintiff.[2] Nonetheless, he advances several theories that purport to preclude this Court from determining that he embezzled Plaintiff's property.

     i.     Debtor is Bound by the Terms of the Financing Agreement Whether or Not He Personally Understood Them

Debtor's counsel elicited testimony from Debtor about whether or not he understood what a security interest is. (Tr. 99:19-100:21.) This testimony was elicited in an effort to argue that Debtor lacked a fraudulent state of mind when he sold Plaintiff's property. (*E.g.*, Def.'s Post-Trial Br. at p. 18).

Debtor's testimony that he did not understand that the financing agreement gave Plaintiff a security interest in Concrete Guys' property does not alter Concrete Guys' liability under the agreement or Debtor's liability as the agreement's guarantor under Virginia law, which governs the financing agreement. (Pl.'s Ex. 1 at p. 4.). The rules for contract formation in Virginia provide that one who signs an agreement without taking the time to read and understand the agreement (or have someone help him understand it) is still chargeable with knowledge of the agreement's contents and is bound by the agreement's terms. *Ayers v. Mosby*, 504 S.E.2d 845, 848 (Va. 1998) (exceptions only for fraud, duress, or mutual mistake).

Debtor's testimony is also undermined by the fact that his son was the employee of Concrete Guys who handled Concrete Guys' finances and contracts, including the financing agreement with Plaintiff. (Tr. 76:9-77:25 & 97:11-98-23.) Concrete Guys hired Debtor's son for this role because he had greater sophistication in the use of electronic devices, financial reporting, and contractual agreements than his father did. (*Id.*) The Court concludes that it is appropriate to impute the son's knowledge to the father, who is the company's principal, owner, and guarantor. *See U.S. v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida Cnty., Wis.*, 965 F.2d 311, 316 (7th Cir. 1992) ("Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation.").

     ii.     Selling a Secured Creditor's Assets in Order to Evade That Secured Creditor's Claim is Embezzlement

Debtor also argues that he could not have committed embezzlement because his sale of Plaintiff's property was innocent, being done solely for the purpose of keeping Concrete Guys afloat. (Def.'s Post-Trial Br. at p. 21.) The Court rejects this argument both as a factual matter and as a legal matter.

---

[2] Among Debtor's core arguments is his assertion that he never transferred any assets to CGI Construction. (Def.'s Post-Trial Br. at p. 25.) Even if this were true, it would make no difference to the analysis. Plaintiff's embezzlement count hinges not on whether Concrete Guys' assets were specifically (and formally) transferred to CGI Construction, but on whether the Debtor caused that collateral to be sold and then caused the proceeds of those sales to be misappropriated. That is what was proven to have occurred at trial and that is also what dictates the outcome of Plaintiff's embezzlement count. Debtor's related core argument (whether CGI Construction's revenue belonged to Plaintiff) fails to rebut Plaintiff's claim for the same reason.

The record is undisputed that the Debtor did not intend to continue operating Concrete Guys, a fact he admitted at trial. (Tr. 66:19-67:6.) What Debtor actually did (and, therefore, presumably intended) was to liquidate Concrete Guys' assets for his own personal benefit and the benefit of his newly formed company. These undisputed facts render inapposite those decisions concluding that "a debtor did not have the necessary fraudulent intent when the debtor used money in violation of contractual obligations [but did so] with the *intent to keep his company afloat so that it could eventually pay all its debts*." *E.g.*, *Sherman v. Potapov*, 403 B.R. 151, 157 (D. Mass. 2009) (emphasis added).

More significantly, even if Debtor had sold Concrete Guys' liened assets for the purpose of keeping Concrete Guys in business, this Court disagrees with the decisions cited by Debtor and has held in other cases that a debtor's failure to remit proceeds from the sale of collateral to the secured creditor in an effort to keep the debtor's business afloat is not a valid defense to a claim of embezzlement. *Moroni*, slip op. at p. 6; *see also In re Sherman*, 603 F.3d 11, 14 (1st Cir. 2010) ("The essence of the common law concept [of embezzlement] is knowing use of entrusted property for an unauthorized purpose; there is no exception for financial joyriding . . . (unauthorized 'borrowing' with intent to repay is still embezzlement, the borrowing being unauthorized)"). Debtor presents no arguments for the extension, modification, or reversal of this Court's precedents, and the Court, therefore, is unpersuaded that its prior interpretation of Section 523(a)(4) is incorrect.

        iii.       Debtor did not Satisfy Plaintiff's Lien Before Misappropriating Plaintiff's Collateral

Debtor finally argues that he had, in fact, fully met his obligations under the financing agreement when Plaintiff sued him and Concrete Guys in state court. (Def.'s Post-Trial Br. at pp. 20-22.) The Court disagrees.

First, Debtor argues that its weekly repayment obligations to Plaintiff automatically declined when Concrete Guys' income stream decreased below its income at the time of signing the financing agreement. (*Id*.) But, while the financing agreement did provide for a mechanism for reducing or abating weekly payments, those reductions or abatements could occur only with the consent of Plaintiff, which was not given here.

Second, this argument also ignores the fact that Plaintiff held a blanket security interest securing the *total* amount of its $100,533 claim (which was later enlarged by various penalties, interest charges, and attorney fees). A temporary abeyance on account of Concrete Guys' issues with its largest client would not have destroyed Plaintiff's security interest for the amount of Plaintiff's claim that remained unpaid. Because Plaintiff's lien was not satisfied at the time Debtor misappropriated Plaintiff's collateral, Debtor's conduct meets the Bankruptcy Code's definition of embezzlement for the reasons previously stated.

Third, all questions regarding whether or not Concrete Guys was current on its obligations under the agreement and whether or not Concrete Guys had defaulted on its obligations under the

agreement have already been adjudicated by the Virginia state court.[3] Debtor cannot collaterally attack that state-court judgment in bankruptcy court. *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000) ("[N]o matter how erroneous or unconstitutional the state court judgment may be, the Supreme Court of the United States is the only federal court that could have jurisdiction to review a state court judgment.").

        B.        Section 523(a)(6) – Conversion

Section 523(a)(6) excepts from discharge any debt for "(1) an injury caused by the debtor (2) willfully and (3) maliciously." *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013). The latter modifiers require "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Because people intend the natural consequences of their actions, a debtor willfully inflicts injury when the harm itself was his goal or the act's objective nature made the injury substantially certain. *Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015). On the other hand, malice requires that a debtor consciously disregarded his duties or acted "without just cause or excuse." *In re Calvert*, 913 F.3d 697, 701 (7th Cir. 2019). In short, the consequences of a debtor's actions must have been objectively foreseeable, and the act itself must have been unjustified. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

It is well-established that conversion, which is an intentional tort, will support a claim brought under Section 523(a)(6). *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 424 (7th Cir. 1985); *Schaul v. Ludwig (In re Ludwig)*, 508 B.R. 48, 57 (Bankr. N.D. Ill. 2014). Proving tortious conversion under Illinois law[4] requires a plaintiff to "establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008).

Debtor does not challenge that Plaintiff proved the first three elements at trial. Instead, Debtor renews his argument that his appropriation of Plaintiff's property was done without the mens rea required to support a Section 523(a)(6) claim (and, interrelatedly, the wrongful state of mind required under tort law) because it was done solely for the purpose of keeping his struggling business afloat. (Def.'s Post-Trial Br. at pp. 27-28.) The Court disagrees.

---

[3] Although the Virginia judgment was a default judgment, (Pl.'s Ex. 29), a default judgment is a judgment on the merits for the purpose of res judicata. *Whitaker v. Ameritech Corp.*, 129 F.3d 952, 957 (7th Cir. 1997). A defaulting defendant admits all well-pleaded allegations in the plaintiff's complaint. *Smith v. Elzey (In re Smith)*, 280 B.R. 436, 441 (Bankr. N.D. Ill. 2002).

[4] As noted previously, Virginia law governs the financing agreement. Tort claims, however, generally fall outside the scope of choice-of-law provisions. *CERAbio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 987 (7th Cir. 2005). A choice of law provision may be construed to govern tort disputes, but only if "it is clear that this is what the parties intended." *Kuehn v. Childrens Hosp., Los Angeles*, 119 F.3d 1296, 1302 (7th Cir. 1997). The financing agreement simply states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regards to any applicable principals of conflicts of law." (Pl.'s Ex. 1 at p. 4.) This language evinces no clear intent to have the tort law of Virginia govern Debtor's liability for any tortious conduct committed in Illinois. The Court, therefore, will apply Illinois tort law in conducting its Section 523(a)(6) analysis.

First, for the reasons already stated in its earlier discussion of the embezzlement count, the Court rejects Debtor's assertion that his misappropriation of Plaintiff's property was innocently done without knowledge of Plaintiff's rights as a secured creditor.

Second, "[a] debtor who enters into a security agreement is presumed to know that a sale of secured property would harm the secured creditor." *N. Inv. Co. v. Haynes (In re Haynes)*, 54 B.R. 20, 21 (Bankr. W.D. Wis. 1985). "Business persons are frequently presumed to know that harm will result from conversion of a secured party's collateral and a debtor who actively participates in such a conversion is personally liable." *Standard Bank & Trust Co. v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 581 (Bankr. N.D. Ill. 1989). It was Debtor's obligation to go forward with evidence sufficient to rebut this presumption against him. FED. R. EVID. 301. In order to make that rebuttal, he needed to come forward with evidence that would be sufficient for the Court to find that he acted innocently (or, at most, recklessly) rather than wrongfully, which he failed to do for the reasons already said. 1 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 301.02[3][c] (2d ed. 2023) ("The opponent of the presumed fact, in order to rebut, generally has the burden of presenting enough evidence so that a reasonable jury could be convinced of the non-existence of the presumed fact.").

C.     Section 523(a)(2)(A) – Actual Fraud

Section 523(a)(2)(A) precludes the discharge of any debt "for money, property, services, or an extension, renewal, or refinancing of credit, *to the extent obtained by*. . . actual fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). As the Plaintiff rightly points out, the Supreme Court has held that a fraudulent conveyance scheme can constitute actual fraud under this statute, provided the debtor acted in an intentionally wrongful manner at the time of the transfer. *Husky*, 578 U.S. at 365-66. Because Plaintiff alleges that Debtor fraudulently transferred collateral in an effort to thwart Plaintiff's enforcement of its lien, Plaintiff argues that *Husky* applies and dictates that Debtor's debt to Plaintiff is also nondischargeable under Section 523(a)(2)(A). The Court disagrees.

Unlike other provisions of Section 523, subsection (a)(2) of that statute has a limiting clause: "*to the extent obtained by*." The Seventh Circuit has interpreted this clause to limit an undersecured creditor's recovery to the value of its collateral when the basis of the actual fraud claim is that the debtor fraudulently conveyed that collateral to obstruct the enforcement of the plaintiff's security interest. *See McClellan v. Cantrell*, 217 F.3d 890, 895 (7th Cir. 2000). The portion of the secured creditor's claim that was unsecured at the time of the fraudulent conveyance *is* dischargeable. *Id*.

The problem with Plaintiff's argument is that, while the trial record suggests that Plaintiff was significantly undersecured at the time the fraudulent conveyance took place, the amount of that undersecurity was not clearly established:

1.     When it defaulted on its obligations under the financing agreement in 2018, Concrete Guys still owed $70,529 under the financing agreement. (Pl.'s Ex. 29 at p. 1.)

2.   As of December 9, 2019, Concrete Guys owned equipment worth about $91,495 along with tools of the trade worth about $1,080.45.[5] (Pl.'s Ex. 2 at pp. 3-4.)

   a.   At some unspecified time, Plaintiff repossessed Concrete Guys' "Bobcat" tractor, which was scheduled to be worth $15,000 in 2019. (Tr. 154:18-155:1.)

   b.   As of March 10, 2020, Concrete Guys' Ford F-350 truck was worth about $40,000—about 43% of all its assets—but only had about $8,700 in equity to which Plaintiff's lien could have attached. (Pl.'s Ex. 34 at p. 1.)

3.   As of March 10, 2020, Concrete Guys owed $9,490.71 to a secured creditor of unknown priority. (*Id.*)

Because Plaintiff has prevailed on its other arguments, and because the unsecured amount of its debt has not been clearly established, it is unnecessary to address this final claim. *See Cyrnek v. Oliva (In re Oliva)*, Bankr. No. 17 B 36365, Adv. No. 18 A 00189, 2020 WL 949900, at *4 (Bankr. N.D. Ill. 2020) (observing that courts may refrain from reaching issues that do not materially alter the disposition of a proceeding).

**CONCLUSION**

For each of the foregoing reasons, the Court hereby finds that Plaintiff has established by a preponderance of the evidence that the debt owed to it by Debtor is:

1.   Nondischargeable pursuant to Section 523(a)(4) of the Bankruptcy Code; and
2.   Nondischargeable pursuant to Section 523(a)(6) of the Bankruptcy Code.

---

[5] Concrete Guys also scheduled some unpaid receivables in its bankruptcy cases. However, the uncontroverted testimony at trial was that Plaintiff enforced its lien rights against the bulk of these receivables through court processes, (Tr. 111:24-113:20), and that Concrete Guys never collected its other receivables. (Tr. 89:16-23.)

Having so found, the Court will enter judgment in favor of Plaintiff and against Debtor on Plaintiff's second and third counts and for the entire amount of Plaintiff's claim[6] by a separate order.

**ENTERED:**

**DATE: <u>August 21, 2023</u>**

<u>Donald R. Cassling</u>
**Donald R. Cassling**
**United States Bankruptcy Judge**

---

[6] Without crafting any proper argument and confining his commentary to a single sentence, Debtor's counsel asserts that whatever portion of Plaintiff's attorney fees relate to "the non-chargable portion of the debt should be held to be non-dischargeable." (Def.'s Post-Trial Br. at pp. 28-29.) The case Debtor cites, *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380 (Bankr. N.D. Ill. 1994), appears to support Debtor's notion that the dischargeability of attorney fees is determined based on whether or not the underlying claim for which those fees accrued is dischargeable. However, the Court need not decide if *Pawlinski* was correctly decided because Debtor has not supported his seeming request for a bifurcation of Plaintiff's claim into a dischargeable debt and a nondischargeable debt with any facts or any law that would justify that bifurcation, which waives the request (to the extent that one has been made). *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived.").